IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | |
|---|---|
| CURTISS-MANES-SCHULTE, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 2:14-cv-04100-NKL |
| ) | |
| SAFECO INSURANCE COMPANY ) | |
| OF AMERICA, ) | |
| ) | |
| Defendant. ) | |

**ORDER**

Plaintiff Curtiss-Manes-Schulte (CMS), a general contractor, filed this lawsuit against Defendant Safeco Insurance Company of America, a surety, alleging breach of contract and vexatious refusal. The lawsuit arises out of Safeco's denial of a claim filed by CMS under a performance bond issued by Safeco to one of CMS's subcontractors, Balkenbush Mechanical, Inc. Before the Court is Safeco's Motion for Summary Judgment, which is based on Safeco's argument that CMS did not provide notice of Balkenbush's default sufficient to trigger Safeco's duties under the performance bond. [Doc. 19]. For the reasons set forth below, the Motion is denied.

**I. Undisputed Facts**

Plaintiff, CMS, was the general contractor for a renovation project located at Fort Leonard Wood, Missouri. On October 19, 2010, it entered into a $1.5 million[1]

---

[1] The subcontract was originally for approximately $1.35 million, but was modified by subsequent "change orders" submitted by CMS to Balkenbush for additional work.

1

subcontract with Balkenbush Mechanical to replace an air conditioning system for the Fort Leonard Wood project. [Doc. 20-3]. The subcontract between CMS and Balkenbush required Balkenbush to secure a performance bond for the work. *Id.* at 1. On October 26, 2010, Defendant Safeco, as the surety for Balkenbush, issued a performance bond with CMS as the obligee and Balkenbush as the principal. [Doc. 20-4].

The subcontract between CMS and Balkenbush outlines what remedies are available to CMS should Balkenbush render unsatisfactory performance. [Doc. 20-3]. Likewise, the performance bond issued by Safeco also lists what remedies are available should Balkenbush default on its obligations under the subcontract. [Doc. 20-4].

By October 2011, CMS was aware that Balkenbush's work on the project was behind schedule. That concern was communicated to Safeco and Liberty Mutual Surety (presumably affiliated with Safeco for the purpose of the bond) on July 30, 2012, through a "Contract Bond Status Query." [Doc. 29-4]. The Contract Bond Status Query, which was sent to CMS by Liberty Mutual Surety,[2] requested information from CMS "[i]n order to allow us to monitor the progress of our contractor." *Id.* In the Contract Bond Status Query, CMS stated that the contract had not been completed, that work had not progressed satisfactorily, and that the contract was "9 months past due – liquidated damages will be assessed." *Id.* CMS also stated that the probable completion date would be "? 30 days – been saying this for several months now."

---

[2] Even though the Contract Bond Status Query is on Liberty Mutual Surety letterhead, Safeco does not allege in its briefs that it did not receive CMS's answers to the questions on the form. Further the Contract Bond Status Query states that the bond was executed by Safeco and lists the corresponding bond number. Therefore, the Court will presume that Safeco received the completed Contract Bond Status Query because Safeco has not argued otherwise.

2

At around that same time, in July 2012, and every month thereafter through September 2013, Safeco paid a construction consulting firm and a law firm to investigate, defend, and resolve other claims filed against Balkenbush on performance bonds Safeco had issued for other, unrelated projects that did not involve CMS. [Docs. 29-16, 29-21]. In December 2012, Safeco filed a lawsuit against Balkenbush alleging losses from claims on four of those other bonds. [Doc. 29-16]. In January 2013, the president of Balkenbush Mechanical filed a petition in the United States Bankruptcy Court for the Western District of Missouri. [Doc. 29-18]; *see also* Case No. 13-20008-drd7. That same month, Safeco's counsel entered their appearance on behalf of Safeco in the bankruptcy proceeding. [Doc. 29-20].

While Balkenbush's bankruptcy proceeding was ongoing, CMS took steps to finish the air conditioning work that was supposed to be completed by Balkenbush. After an April 2013 walkthrough by the owner of the property, the United States, CMS hired various contractors throughout the spring and summer to finish the work and to complete a "punch list" of items identified by the United States as incomplete. The project was completed in October 2013, and the United States assessed liquidated damages against CMS for its delay in completing the project.

On December 12, 2013, CMS submitted a "Notice of Claim on Subcontract Bonds" letter to Safeco. [Doc. 29-5]. The letter demanded $65,449.93, which was the amount CMS incurred as a result of Balkenbush's default. The letter states that due to the default, CMS hired substitute performance to complete the project and to correct discrepancies. It lists costs incurred by CMS to complete the project and the amount of

3

liquidated damages assessed against it by the United States. The letter also points out that CMS completed the Contract Bond Status Query in July 2012, which indicated that the project was not complete and was behind. On February 5, 2014, Safeco denied CMS's performance bond claim. [Doc. 29-10]. In its denial letter to CMS, Safeco stated:

> Notwithstanding Balkenbush's numerous alleged delays and deficiencies that appear to have been known to CMS as early as October 2011, CMS did not notify and give Balkenbush an opportunity to cure those alleged defaults. CMS also failed to notify Safeco of Balkenbush's alleged defaults and did not notify Safeco of any allegedly incomplete and/or deficient Subcontract work until December 2013, long after CMS hired and paid for the completion and correction of that work.
>
> CMS's correction and completion of Balkenbush's allegedly incomplete and deficient work without declaring a default and without notifying Safeco violated the terms of the Performance Bond, deprived Safeco of an opportunity to mitigate damages, stripped Safeco of its rights and nullified Safeco's duty to perform.

*Id.* at p. 2. This litigation ensued shortly thereafter.

## II. Discussion

Safeco argues that summary judgment should be entered on CMS's claims for breach of contract and vexatious refusal claims for two reasons. First, Safeco asserts summary judgment is appropriate because Safeco's obligations under the performance bond were not triggered because Balkenbush and Safeco were entitled to a three-day written default notice which CMS never sent. Second, Safeco argues that CMS's failure to issue the written default notice denied Safeco of its right under the performance bond to take remedial action and to mitigate its damages.

### A. Was Safeco entitled to a three-day written default notice before Safeco's obligations under the performance bond were triggered?

4

Safeco argues that summary judgment in appropriate because its duties under the subcontract were only triggered after it and Balkenbush received a three-day written default notice from CMS. "The cardinal principle of contract interpretation is to ascertain the intention of the parties and to give effect to that intent. The terms of a contract are read as a whole to determine the intention of the parties and are given their plain, ordinary, and usual meaning." *Dunn Indus. Grp., Inc. v. City of Sugar Creek*, 112 S.W.3d 421, 428 (Mo. 2003) (internal citations omitted). As to notice provisions, the "usual rule of contracts [is] that an obligor is not discharged because he is not notified that the time for his performance is due, unless he has stipulated for notification." *U.S. v. Minn. Trust Co.*, 59 F.3d 87, 90 (8th Cir. 1995). This is because:

> The surety, when he undertakes his obligation, must realize that there is a risk that the principal will not perform. If the surety wishes notification, he can insert a requirement for it in his contract. If he does not stipulate for notification, the surety has the burden of ascertaining when, if ever, his performance is due, and of taking whatever steps seem appropriate to him for his own protection.

*Id.* (citing to the rational described in the Restatement of Security § 136).

In support of its argument that it was due notice of Balkenbush's default before its duties under the performance bond were triggered, Safeco points to Article 4 of the performance bond. Article 4 states:

> 4. **PRINCIPAL DEFAULT.** Whenever the Principal [Balkenbush] shall be, and is declared by the Obligee [CMS] to be in default under the Subcontract, with the Obligee having performed its obligations in the Subcontract, the Surety [Safeco] may promptly remedy the default, or shall promptly:
>   4.1 **COMPLETE SUBCONTRACT**. . . .
>   4.2 **OBTAIN NEW CONTRACTORS**. . . .
>   4.3 **PAY OBLIGEE**. . . .
>   4.4 **DENY LIABILITY**. . . .

5

[Doc. 20-4, p. 2]. However, nothing in Article 4 of the performance bond or in any other provision of the performance bond requires CMS – or Balkenbush, for that matter – to provide notice of Balkenbush's default to Safeco. The performance bond states that Safeco's duty is triggered when Balkenbush is declared by CMS to be in default, but it does not say that notice of a default declaration is due to Safeco, when the declaration must take place, or how the declaration must be made. Further, there is no dispute that in July 2012, Safeco and Liberty Mutual Surety inquired about the progress of the project through a Contract Bond Status Query "[i]n order to allow [them] to monitor the progress of [their] contractor." [Doc. 29-4]. The fact that Liberty Mutual and Safeco sent this inquiry suggests that they were aware of the need to check on their contractors.

Next, Safeco points to the "Failure of Performance" provision in the subcontract between Balkenbush and CMS to argue that Safeco was entitled to a 3-day written default notice by CMS. The subcontract between CMS and Balkenbush states:

> **FAILURE OF PERFORMANCE**
> Should Sub-Contractor fail to satisfy contractual deficiencies or to commence and continue satisfactory correction of the default with diligence or promptness within three (3) working days from receipt of Curtiss-Manes-Schulte, Inc. written notice, then Curtiss-Manes-Schulte, Inc., without prejudice to any right or remedies, shall have the right to take whatever steps it deems necessary to correct deficiencies and charge the cost thereof to Sub-Contractor, who shall be liable for such payment, including reasonable overhead, profit and attorneys' fees.

[Doc. 20-3, p. 2]. Safeco asserts that it is entitled to the 3-day notice provision in the subcontract because Article 1 of the performance bond incorporates the subcontract by reference. While the "Failure of Performance" provision of the subcontract does have a written notice requirement, the requirement is that CMS give Balkenbush – not Safeco –

notice of any deficiencies or defaults and three days to cure or "commence and continue satisfactory correction of the default with diligence or promptness." [Doc. 29-1, p. 2]. Reading the subcontract as a whole, this notice provision is clearly meant to protect Balkenbush's interest in completing the contract and to prevent CMS from unilaterally replacing Balkenbush without notice or without an opportunity to cure any deficiency or default perceived by CMS. *Cf. Thomas v. A.G. Elec., Inc.*, 304 S.W.3d 179, 187-88 (Mo. Ct. App. 2009) (stating in the context of a notice provision in an insurance contract that "the function of a notice requirement is simply to protect the insurer from being prejudiced."). This provision is not a notice of default requirement that is required to trigger Safeco's obligations. Further, the subcontract between CMS and Balkenbush was executed before Safeco was established as a surety, so it does not make sense to interpret the subcontract as protecting Safeco's rights or as reflecting Safeco's intentions. The fact that the performance bond incorporates the subcontract by reference is also unpersuasive because the subcontract is silent about notice to Safeco by either Balkenbush or CMS.

Nonetheless, Safeco argues that since CMS never sent a 3-day written notice to Balkenbush, it owes no duty to CMS. However, as discussed above, the "Failure of Performance" provision in the subcontract is meant to give Balkenbush a chance to cure a default or deficiency before CMS can exercise its contract options. In this case, such notice was not necessary because Balkenbush declared itself to be in default sometime after July 2012. A 3-day written notice by CMS after this point would have been useless. Further, even if CMS had provided written notice of a deficiency or default to Balkenbush, nothing in the subcontract requires either CMS or Balkenbush to notify

7

Safeco of the default, and Safeco does not explain how CMS's failure to comply with a technical curative notice requirement it owed to Balkenbush affected Safeco's ability to perform under the performance bond or its duty to monitor Balkenbush.

As a matter of law, neither the subcontract nor the performance bond required specific notice of a default to Safeco. However, the fact remains that Balkenbush was never technically "declared" by CMS to be in default, and thus, Safeco argues, its duties were never triggered. However, while it is likely that in most instances the general contractor would be the party declaring a default, Balkenbush declared itself to be in default. If Safeco took the steps necessary to protect itself by requiring either Balkenbush or CMS to provide specific notice of a default, Safeco would have known of the default. The fact that CMS technically did not declare the default because Balkenbush declared it first does not discharge Safeco from its duties. To hold otherwise would be inconsistent with the "modern trend" in Missouri to "exercise restraint in requiring strict compliance with the terms of notice provisions," *Thomas v. A.G. Elec., Inc.*, 304 S.W.3d 179, 187 (Mo. Ct. App. 2009), especially since the notice requirement in this case is not actually owed to the party attempting to use it to avoid liability. The Missouri Supreme Court, quoting the Louisiana Court of Appeals, has stated:

> The function of the notice requirement is simply to prevent the insurer from being prejudiced, not to provide a technical escape-hatch by which to deny coverage in the absence of prejudice nor to evade the fundamental protective purpose of the insurance contract to assure the insured and the general public that liability claims will be paid . . . .

*Weaver v. State Farm Mut. Auto. Ins. Co.*, 936 S.W.2d 818, 820 (Mo. banc. 1997) (quoting *Miller v. Marcantel*, 221 So.2d 557, 559 (La. App. 1969); *see also Thomas*, 304

S.W.3d at 187-88. Absent a specific notice requirement to Safeco, Safeco cannot use Balkenbush's own declaration of default – rather than a declaration by CMS – as a "technical escape-hatch" by which to avoid liability.

> **B. Did CMS's failure to issue a written default notice and its late demand letter deny Safeco of its right under the performance bond to take remedial action and mitigate its damages?**

Safeco also argues that CMS's failure to issue a written default notice denied Safeco of its right under Article 4 of the performance bond to complete the subcontract or obtain new contractors. However, as discussed above, CMS was not required to provide a written notice, and Safeco is not discharged of its duties under the performance bond by CMS's failure to provide such notice. The Eighth Circuit's decision in *American Surety Co. of New York v. United States*, 317 F.2d 652 (8th Cir. 1963), is analogous. In *American Surety*, the United States entered into a supply contract with a company for the production of bomb releases. *Id.* at 654. A surety insured the manufacturer's work under a performance bond which "contained no provision requiring notice to the surety in the event of . . . default." *Id.* When the manufacturer failed to fulfill its obligation, the United States threatened default and contract termination absent an ability to correct the deficiency. This threat was sent via a written letter to the manufacturer, and a copy of this letter was sent to the surety. *Id.* When the manufacturer decided not to proceed with the contract, the United States invited bids to supply the bomb releases and ultimately contracted with a new manufacturer. Approximately nine months after the contract with the original manufacturer was terminated, the United States made a demand upon the manufacturer's surety for the difference in the cost between the original and subsequent

9

contract. *Id.* at 655. One of the surety's objections to liability was that it was not afforded notice of the new invitation for bids or of the United States' option under the supply contract to terminate the agreement. The surety argued that the United States "owed it, as the responsible party, the duty of timely notice and advice of conditions which could cause loss so that it might proceed to assist [the manufacturer] financially or by locating a substitute supplier or a favorable new bidder, . . . and otherwise to protect itself." *Id.* at 656. The Eighth Circuit rejected this argument and observed that the surety received copies of the letter threatening termination, that the manufacturer was never able to carry out even part of the contract so the surety could not now complain that it did not have knowledge, and that "neither the performance bond nor the [manufacturing supply] contract contained any provision requiring notice to the surety" of the default. *Id.* The Eighth Circuit cited to the last factor as conclusive alone and held that "to the extent, if any, there was lack of notice to the surety here, this lack did not release it from its obligations under the performance bond." *Id.*

This case is factually similar and requires a similar legal outcome. Like the surety in *American Surety*, Safeco also received notice of troubled waters in the form of the July 2012 Contract Bond Status Query. There is also evidence that Safeco was aware of other Balkenbush defaults around the same time and investigated Balkenbush in those defaults. It is also undisputed that in January 2013 – four to five months before CMS hired replacement contractors – Safeco knew Balkenbush had filed for bankruptcy. When Balkenbush defaulted, CMS hired replacement contractors without notifying Safeco of its intention to do so, and similarly to the surety in *American Surety*, Safeco argues that it

10

was entitled to notice so that it could assist in locating a substitute supplier or otherwise protect its interest. While this case is distinguishable because Balkenbush had completed some of the work – as opposed to none of the work in *American Surety* – the reasoning is the same. With Safeco's investigative efforts, its appearance in Balkenbush's bankruptcy in January 2013, and its filing of claims against Balkenbush for other bonds in December 2012, Safeco cannot now complain that it did not have knowledge that a default had occurred. Finally, in this case as in *American Surety*, there is no provision requiring notice of Balkenbush's default – a "[conclusive] . . . factor alone" for the Eighth Circuit.

Safeco points to the Eighth Circuit's decision in *Cont'l Bank & Trust Co. v. Am. Bonding Co.,* 605 F.2d 1049 (8th Cir. 1979), to argue that CMS's delay in filing its claim absolves Safeco from liability under the performance bond. In *Cont'l Bank & Trust*, the Eighth Circuit agreed with the district court that a surety was liable on the bonds, but remanded the case for a redetermination of the proper measure of damages owed by the surety for the default. *Id.* at 1057. In making this conclusion, the Eighth Circuit remarked in a footnote that where there is no notice requirement in the bond, a failure to notify a surety of a principal's default does not discharge a surety's obligations under the bond, but that "the obligee [CMS] may not delay before notifying the surety [Safeco] and then insist that the measure of the surety's liability includes escalated costs arising in the interim between default and demand." *Id.* at n. 17. Safeco relies on this statement to argue that it should not be liable on the bond because CMS delayed making its bond claim. However, the Eighth Circuit in *Cont'l Bank & Trust* concluded that the surety was liable for the bonds and that any delay in filing a demand affected damages, not liability.

11

Likewise, CMS's delay in filing a claim may affect a damages calculation, but does not excuse Safeco's obligations under the performance bond.

Because notice to Safeco was not required under the performance bond or the subcontract, CMS's failure to provide notice of the default or of its intention to hire replacement contractors does not discharge Safeco's obligations to CMS under the performance bond. Therefore, Safeco's Motion for Summary Judgment is denied.

## III. Conclusion

For the reasons set forth above, Safeco's Motion for Summary Judgment, [Doc. 19], is denied.

s/ Nanette K. Laughrey  
NANETTE K. LAUGHREY  
United States District Judge

Dated: January 29, 2015  
Jefferson City, Missouri