**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION**

CURTISS-MANES-SCHULTE, INC.,

    Plaintiff,

  v.                              No. 2:14-cv-04100-NKL

SAFECO INSURANCE COMPANY
OF AMERICA,

    Defendant.

**ORDER**

Plaintiff Curtiss-Manes-Schulte (CMS), a general contractor, filed this lawsuit against Defendant Safeco Insurance Company of America, a surety, alleging breach of contract and vexatious refusal. The lawsuit arises out of Safeco's denial of a claim filed by CMS under a performance bond issued by Safeco to one of CMS's subcontractors, Balkenbush Mechanical, Inc. In October 2014, Safeco filed a Motion for Summary Judgment, and argued that it was entitled to summary judgment on CMS's claims because CMS did not provide notice of Balkenbush's default sufficient to trigger Safeco's duties under the performance bond. [Doc. 19]. The Court denied this Motion, concluding that neither the subcontract between CMS and Balkenbush nor the performance bond issued by Safeco required CMS to provide notice to Safeco of Balkenbush's default or CMS's intention to hire replacement contractors. [Doc. 39]. Before the Court is Safeco's Motion for Reconsideration of this Court's Order denying Safeco's Motion for Summary Judgment, [Doc. 40]. The Motion for Reconsideration is granted. The Order denying Safeco's Motion for Summary Judgment is vacated. Safeco's Motion for Summary Judgment, [Doc. 19], is granted.

1

## I. Undisputed Material Facts

Plaintiff, CMS, was the general contractor for a renovation project located at Fort Leonard Wood, Missouri. On October 19, 2010, it entered into a $1.5 million[1] subcontract with Balkenbush Mechanical to replace an air conditioning system for the Fort Leonard Wood project. [Doc. 20-3]. The subcontract between CMS and Balkenbush required Balkenbush to secure a performance bond for the work. *Id.* at 1. On October 26, 2010, Defendant Safeco, as the surety for Balkenbush, issued a performance bond with CMS as the obligee and Balkenbush as the principal. [Doc. 20-4].

The subcontract between CMS and Balkenbush outlines what remedies are available to CMS should Balkenbush render unsatisfactory performance. [Doc. 20-3]. The subcontract between CMS and Balkenbush states:

> **FAILURE OF PERFORMANCE**
> Should Sub-Contractor fail to satisfy contractual deficiencies or to commence and continue satisfactory correction of the default with diligence or promptness within three (3) working days from receipt of Curtiss-Manes-Schulte, Inc. written notice, then Curtiss-Manes-Schulte, Inc., without prejudice to any right or remedies, shall have the right to take whatever steps it deems necessary to correct deficiencies and charge the cost thereof to Sub-Contractor, who shall be liable for such payment, including reasonable overhead, profit and attorneys' fees.

*Id.* at p. 2. Likewise, the performance bond issued by Safeco lists what remedies are available should Balkenbush default on its obligations under the subcontract and at what point Safeco is obligated to provide those remedies. [Doc. 20-4]. Article 4 of the performance bond states:

> 4. **PRINCIPAL DEFAULT.** Whenever the Principal [Balkenbush] shall be, and is declared by the Obligee [CMS] to be in default under the Subcontract, with the Obligee having performed its obligations in the Subcontract, the Surety [Safeco] may promptly remedy the default, or shall promptly:

---

[1] The subcontract was originally for approximately $1.35 million, but was modified by subsequent "change orders" submitted by CMS to Balkenbush for additional work.

> 4.1 **COMPLETE SUBCONTRACT**. . . .
> 4.2 **OBTAIN NEW CONTRACTORS**. . . .
> 4.3 **PAY OBLIGEE**. . . .
> 4.4 **DENY LIABILITY**. . . .

*Id.* at p. 2]. The performance bond incorporates the subcontract by reference. *Id.* at p. 2, ¶ 1.

By October 2011, CMS was aware that Balkenbush's work on the project was behind schedule. That concern was communicated to Safeco and Liberty Mutual Surety (presumably affiliated with Safeco for the purpose of the bond) on July 30, 2012, through a "Contract Bond Status Query." [Doc. 29-4]. CMS stated that the contract was not complete, that work had not progressed satisfactorily, and that the contract was "9 months past due – liquidated damages will be assessed." *Id.* CMS also stated that the probable completion date would be "? 30 days – been saying this for several months now." *Id.* CMS admits it did not declare Balkenbush in default in the "Contract Bond Status Query." [Doc. 41, p. 3]. At some point after July 2012, Balkenbush walked off the job, and in January 2013, the president of Balkenbush, Todd Balkenbush, filed a personal petition in the United States Bankruptcy Court for the Western District of Missouri. [Doc. 29-18].

While Todd Balkenbush's bankruptcy proceeding was ongoing, CMS took steps to finish the air conditioning work that was supposed to be completed by Balkenbush. After an April 2013 walkthrough by the owner of the property, CMS hired various contractors throughout the spring and summer to finish the work and to complete a "punch list" of items identified by the owner as incomplete. The project was completed in October 2013, and the owner assessed liquidated damages against CMS for its delay in completing the project.

On December 12, 2013, CMS submitted a "Notice of Claim on Subcontract Bonds" letter to Safeco. [Doc. 29-5]. The letter demanded $65,449.93, which was the amount CMS incurred as a result of Balkenbush's default. The letter states that due to the default, CMS hired substitute

3

performance to complete the project and to correct discrepancies.  It lists costs incurred by CMS to complete the project and the amount of liquidated damages assessed against it by the United States.  The letter also points out that CMS completed the Contract Bond Status Query in July 2012, which indicated that the project was not complete and was behind.  On February 5, 2014, Safeco denied CMS's performance bond claim, stating in part that "CMS's correction and completion of Balkenbush's allegedly incomplete and deficient work without declaring a default and without notifying Safeco violated the terms of the Performance Bond, deprived Safeco of an opportunity to mitigate damages, stripped Safeco of its rights and nullified Safeco's duty to perform." [Doc. 29-10, p. 2]. This litigation ensued shortly thereafter.  CMS admits that it "did not ever find Balkenbush in default of their contract" because "Balkenbush found themselves in default of their contract when they walked off the job." [Doc. 41-1, depo. pg. 109:14-19].

## II. Discussion

"Motions for reconsideration serve a limited function: to correct manifest errors of law or fact or to present newly discovered evidence." *Arnold v. ADT Sec. Servs., Inc.*, 627 F.3d 716, 721 (8th Cir.2010) (quoting *Hagerman v. Yukon Energy Corp.*, 839 F.2d 407, 414 (8th Cir.1988)).  Upon reconsideration of the law of construction performance bonds, the plain language of the performance bond in this case, and CMS's concession that it did not declare Balkenbush to be in default, the Court grants Safeco's Motion for Reconsideration, vacates its January 29, 2015 Order denying Safeco's Motion for Summary Judgment, and grants Safeco's Motion for Summary Judgment, [Doc. 19].

As the Court previously stated, "the "usual rule of contracts [is] that an obligor is not discharged because he is not notified that the time for his performance is due, unless he has

4

stipulated for notification." *U.S. v. Minn. Trust Co.*, 59 F.3d 87, 90 (8th Cir. 1995). This is because:

> The surety, when he undertakes his obligation, must realize that there is a risk that the principal will not perform. If the surety wishes notification, he can insert a requirement for it in his contract. If he does not stipulate for notification, the surety has the burden of ascertaining when, if ever, his performance is due, and of taking whatever steps seem appropriate to him for his own protection.

*Id.* (citing to the rational described in the Restatement of Security § 136). Previously, the Court concluded that nothing in the performance bond or subcontract required CMS to provide notice of Balkenbush's default to Safeco before Safeco's duties under the performance bond were triggered. However, upon review of case law interpreting provisions nearly identical to section 4 of the performance bond in this case, the Court concludes that the phrase "[w]henever the Principal [Balkenbush] shall be, and is declared by the Obligee [CMS] to be in default under the Subcontract" is a provision that stipulates for notice, acts as a condition precedent to any duty owed by Safeco, and is inserted into performance bonds "to avoid the common-law rule that a secondary obligor such as [the surety] is not entitled to notice when the time for its performance is due." *See L & A Contracting Co. v. Southern Concrete Servs.*, 17 F.3d 106, 111 (5th Cir. 1994) (referring to the nearly identical performance bond provision in that case as a "notice of default provision").

Cases from the Fifth and Second Circuits interpreting language nearly identical to that found in section 4 of the performance bond are instructive. In *L & A Contracting*, a general contractor entered into a subcontract with a concrete company. The subcontract between the general and subcontractor required the subcontractor to obtain a performance bond. The performance bond stated that the surety would become liable to take certain actions to remedy

5

the subcontractor breach "[w]henever Principal shall be, and shall be declared by Obligee to be in default under the subcontract, the Obligee having performed Obligee's obligations thereunder." *L & A Contracting*, 17 F.3d at 109 n. 6. The relationship between the two companies soon deteriorated, and the general contractor sent a letter to the subcontractor and the surety requesting that the surety "take the necessary steps to fulfill this contract to prevent any further delays and costs to" the general contractor. The surety did not respond and took no action. The subcontractor eventually completed its obligations under the contract, but the general contractor sued the subcontractor and the surety for breach of contract. The district court concluded that the subcontractor breached the subcontract and that both the subcontractor and the surety were liable to the general contractor. *Id.* at 109. The subcontractor and the surety appealed and argued that the general contractor did not declare a default sufficient enough to trigger its duties under the performance bond. In vacating the judgment against the surety and rendering judgment in the surety's favor, the Fifth Circuit concluded that the general contractor did not establish a declaration of default and that none of the letters sent to the surety or any other correspondence amounted to an "unequivocal declaration of default." *Id.* at 111. Interpreting the notice of default provision, the Fifth Circuit stated that the performance bond imposed liability on the surety for the subcontractor's breach "only if two conditions exist[ed]. First, [the subcontractor] must have been *in default* of its performance obligations under the subcontract. Second, [the general contractor] must have *declared* [the subcontractor] to be in default." *Id.* at 110 (emphasis in original). The Fifth Circuit stated that the phrase "declared . . . to be in default" was not ambiguous and that

> a declaration of default sufficient to invoke the surety's obligations under the bond must be made in clear, direct, and unequivocal language. The declaration must inform the surety the principal has committed a material breach or series of breaches of the

6

> subcontract, that the obligee regards the subcontract as terminated, and that the surety must immediately commence performing under the terms of its bond.

*Id.* at 111. The Fifth Circuit reasoned that "[s]erious legal consequences attend a declaration of default" and that "[g]iven the consequences that follow a declaration of default, it is vital that the declaration be made in terms sufficiently clear, direct, and unequivocal to inform the surety that the principal has defaulted on its obligations and the surety must immediately commence performing under the terms of its bonds." *Id.*[2]

Citing *L & A Contracting*, the Second Circuit reached a similar outcome in *Elm Haven Constr. Ltd. P'ship v. Neri Constr. LLL*, 376 F.3d 96 (2d Cir. 2004). In *Elm Haven*, a general contractor and a subcontractor entered into a subcontract which required the subcontractor to obtain a performance bond and a payment bond. The performance bond stated that "[w]henever Principal shall be, and be declared by Obligee to be in default under the subcontract, the Obligee having performed Obligee's obligations thereunder" the surety had certain obligations under the performance bond. *Id.* at 98. The subcontract between the general and subcontractor was incorporated into the performance bond by reference and outlined procedures to be followed in the event of a default by the subcontractor. *Id.* Like in this case, the general contractor was

---

[2] *L & A Contracting* has also been cited by the Eighth Circuit in *Bremer Bank v. John Hancock Life Ins. Co.*, 601 F.3d 824 (8th Cir. 2010). In *Bremer Bank*, a case unrelated to construction performance bonds, an owner participant in an aircraft transaction sued a trustee and the lender participant alleging that the owner participant's equity in the aircraft and its lease were improperly extinguished by the trustee in the aftermath of the aircraft's lessee's bankruptcy filing. The owner participant claimed, among other arguments, that that the defendants failed to declare a default before exercising remedies under the aircraft's lease. The Eighth Circuit disagreed, concluding that a notice sent by one of the defendants "left no doubt" that one of the defendants was declaring a default and exercising its remedies. *Id.* at 830. The owner participant claimed that the default declaration was insufficient and cited to *L & A Contracting*. The Eighth Circuit stated that *L & A Contracting* was "not to the contrary" of its decision because in *L & A Contracting*, the contractor did not use the word "default" in its notices or clarify whether the subcontractor's deficiencies amount to a material breach justifying a default, but in the case before it, the defendants "unambiguously declared that events of default had occurred and them emphatically stated it was exercising remedies for which a default declaration was a condition precedent." *Id.* The Eighth Circuit remarked that *L & A Contracting* required "clear, direct, and unequivocal language" that would "inform the surety that the principal has committed a material breach, . . . that the obligee regards the subcontract as terminated, and that the surety must immediately commence performing under the terms of its bond'" and that the notice provided by defendants did so. *Id.* (quoting *L & A Contracting*, 17 F.3d at 111).

7

required to give the subcontractor seventy-two hours written notice to cure a default, and if the subcontractor did not cure, the general contractor could perform the work itself, withhold payment from the subcontractor, and/or terminate its subcontract with the subcontractor and hire another subcontractor. *Id.* Shortly after the work began, the general and subcontractor began complaining about each other's performance. The general contractor sent letters directly to the surety requesting "assistance in this matter" and informing the surety that certain portions of the work for which the subcontractor was responsible would be performed by others because the subcontractor failed to perform. *Id.* at 99. The general contractor eventually entered into a new subcontract with another company to complete the work. After doing so, the general contractor sent a final letter to the surety stating that it was forced to supplement the subcontractor's work, that the subcontractor had "virtually abandoned the job," and that as a result, it had incurred significant losses. *Id.* The surety responded by denying the claim because "there has been no declaration of default which would trigger the surety's obligations." *Id.* The general contractor sued the surety, and the district court granted summary judgment in favor of the surety after concluding that the general contractor did not make a "sufficiently clear, direct, and unequivocal or precise declaration of default." *Id.* The general contractor appealed, and the Second Circuit affirmed. In doing so, the Second Circuit reiterated that in order to trigger the surety's liability under the default declaration provision of the performance bond, two conditions had to be met. The subcontractor had to be in default, and the general contractor had to declare the subcontractor in default under the subcontract in precise terms. *Id.* at 100. The Second Circuit concluded that up until the last letter sent by the general contractor to the surety, none of the letters were sufficiently clear to declare a default. The last letter did function as a declaration of default. However, the surety was excused from performance because by the time the general

8

contractor sent the final letter, it had already hired replacement contractors and had therefore "breached its obligation to [the surety] under the Performance Bond to give [the surety] the option to cure [the subcontractor's] default." *Id.*

The provisions interpreted in *L & A Contracting* and *Elm Haven* are nearly identical to the provision triggering Safeco's performance in this case. Under section 4 of the performance bond in this case, then, Safeco's duty to complete the subcontract, obtain new contractors, pay CMS, or deny liability is triggered when (1) Balkenbush is in default and when (2) CMS declares Balkenbush to be in default under the subcontract. CMS concedes that it "did not ever find Balkenbush in default of their contract," [Doc. 41-1, depo. pg. 109:14-19], and therefore, the second condition required to trigger Safeco's duty under the performance bond was not met. Further even if the "Notice of Claim on Subcontract Bonds" was sufficiently clear to declare a default, this letter was sent in December 2013, nearly eight months after CMS hired replacement contractors and deprived CMS of its right under the performance bond to either complete the subcontract or obtain or aid in obtaining new subcontractors. *See Elm Haven*, 376 F.3d at 100. Therefore, Safeco is entitled to summary judgment against CMS's claims.[3]

---

[3] In this Court's original Order denying Safeco's Motion for Summary Judgment, the Court relied on *American Surety Co. of New York v. United States*, 317 F.2d 652 (8th Cir. 1963), because the facts in that case were similar to the facts in this case. [Doc. 39, pp. 9-11]. However, the Court relied on *American Surety* after determining that the performance bond in this case did not require notice to Safeco of Balkenbush's default. As discussed above, after reviewing case law from other courts interpreting nearly identical performance bond language to mean that an obligee must notify a surety of the principal's default, the Court concludes that the performance bond in this case required a default declaration by CMS before Safeco's duties under the performance bond were triggered. This conclusion means that *American Surety* is no longer analogous in an important way. In *American Surety*, without quoting the language of the performance bond at issue in that case, the Eighth Circuit stated that the performance bond "contained no provision requiring notice to the surety in the event of . . . default." *American Surety*, 317 F.2d at 654. The Eighth Circuit found this fact "conclusive" in determining that the surety could not complain that it did not have knowledge of the default. *Id.* at 656. Having now determined that the declaration of default provision in this case's performance bond requires notice to Safeco of Balkenbush's default, the Court concludes that the facts in *American Surety* are not analogous because the performance bond in *American Surety* did not contain a default declaration provision. The reasoning for why the surety was not released of its duty under the performance bond in *American Surety* – because the surety did not stipulate for notice of a default – does not apply to this case, where Safeco stipulated for notice of a default.

CMS argues that it did not declare Balkenbush to be in default because "Balkenbush found themselves in default of their contract when they walked off the job." [Doc. 41-1, depo. pg. 109:14-19].  However, the plain language of the performance bond specifically requires that a default declaration be made "by the Obligee," who in this case, is CMS.  Further, even if Balkenbush did walk off the job, there is no evidence of any kind of communication to CMS or Safeco of a voluntary default by Balkenbush.  *See* 4A Bruner & O'Connor Construction Law § 12:36 n. 2 ("Contractors going out of business sometimes sign letters of 'voluntary default' under which they admit that they are unable to perform the bonded contract, authorize the obligee to terminate the bonded contract, and consent to the surety taking over performance. Without the obligee's termination of the bonded contract or a letter of 'voluntary default,' the performance bond surety runs a risk of later claims by the contractor of 'tortious interference' with its performance of the contract and domination.  To minimize this risk in the absence of a 'voluntary default' letter, AIA Document A312-1984, Performance Bond (1984) specifically provides for a conference between the obligee, contractor, and surety to discuss the obligee's intent to declare the contractor in default. Once the principal has acknowledged 'voluntary default,' the surety must act promptly in deciding which of its rights it wishes to exercise. . . .") (internal citations omitted).  Therefore, this argument is not persuasive.

In its Order denying Safeco's Motion for Summary Judgment, this Court originally concluded that "the fact that CMS technically did not declare the default because Balkenbush declared it first does not discharge Safeco from its duties" and that "to hold otherwise would be inconsistent with the 'modern trend' in Missouri to 'exercise restraint in requiring strict compliance with the terms of notice provisions.'" [Doc. 39, p. 8].  In coming to this conclusion, the Court cited to *Thomas v. A.G. Elec., Inc.*, 304 S.W.3d 179 (Mo. Ct. App. 2009).   In

determining whether the plaintiffs' claims under a payment bond should be dismissed because the plaintiffs did not comply with a notice requirement set forth in a payment bond, the Missouri Court of Appeals stated that "[t]he modern trend in Missouri courts has been to exercise restraint in requiring strict compliance with the terms of notice provisions." *Id.* at 187. The Missouri Court of Appeals further stated that in insurance cases, absent a showing of prejudice, the insurer cannot defeat its liability under the policy by claiming that the insured failed to give written notice of its claim under the policy and that this same reasoning applied to the notice requirement in the payment bond at issue. However, in *Thomas*, the Missouri Court of Appeals was addressing the issue of a payment bond, not a performance bond like the one in this case – a nuance previously missed by this Court.

It is relevant that when discussing a less rigorous notice standard, the court in *Thomas* was discussing a payment bond and not a performance bond like the one in this case which gives Safeco the option to complete the project or hire new contractors. The distinction is important because a payment bond does not afford the surety the right to complete the contract by takeover or to select new subcontractors to complete the project. *See Miller-Stauch Const. Co. v. Williams-Bungart Elec., Inc.*, 959 S.W.2d 490, 494 (Mo. Ct. App. 1998) (recognizing that payment and performance bonds "are distinguished by different obligations assumed by the surety" and that under a payment bond, "the surety is responsible for certain unsatisfied debts of its principal and has no responsibility related to the completion of the project"). "Where the surety's performance bond options include contract completion by takeover, tender, or financing of the principal," – unlike the payment bond in *Thomas* but like the performance bond issued by Safeco – "timely notice of default is an essential prerequisite to the surety's contract completion obligation and loss mitigation efforts." 4A Bruner & O'Connor Const. Law § 12:36. This is

11

because unlike under a payment bond, when a subcontractor defaults under a performance bond that gives a subcontractor the right to complete the project or hire new contractor, notice of a default allows the surety to exercise its right to select or participate in selecting the lowest bidding subcontractor to complete the project in order to mitigate its damages under the performance bond. *See Dragon Const., Inc. v. Parkway Bank & Trust*, 678 N.E.2d 55, 58 (Ill. App. Ct. 1997) (quoted by Bruner & O'Connor at § 12:36). In other words, notice under a performance bond that gives the surety a right to complete the project or hire new subcontractors is essential to that surety's right to mitigate its damages. And by failing to declare a default, the obligee "prejudices the surety's right to exercise its performance bond options." Bruner & O'Connor at § 12:36. The relevant distinction as to whether notice is essential or less strictly enforced is whether the surety has the right and responsibility to complete the contract at the time of default. *See id.* (stating that courts enforce notice of default requirements less rigorously "[w]here the surety's performance bond option is *limited to indemnification* of the obligee for its losses in completing the contract and *affords no right to the surety to oversee completion*") (emphasis added).

  It makes sense that a less strict notice standard may apply to payment bonds and performance bonds affording no right to the surety to oversee completion, because the opportunities for the surety to mitigate its damages are less. But where the surety has a right to choose who completes the contract and at what cost, notice of default so that the surety may step in and exercise that right is essential. This reasoning is consistent with the reasoning in *Thomas* as to why a less strict notice requirement was imposed for the payment bond in that case. The Missouri Court of Appeals stated that the function of the notice requirement in the payment bond was to afford the surety of an opportunity to investigate the claim before paying or denying

12

liability. *Thomas*, 304 S.W.3d at 188. The court also noted that the surety "may be hard-pressed to show prejudice" in the context of that case because "the nature of the wrong . . . does not likely become more difficult to investigate over time despite a lack of prompt notice." *Id.* at 188 n. 12. The performance bond in this case, however, affords Safeco the right to oversee completion of the subcontract, should it choose to do so, and the function of the notice requirement in this case is not simply to allow Safeco to investigate whether it will pay a claim, but to allow Safeco to procure an alternative method to complete the project while the project is ongoing. Further, unlike the wrong in *Thomas*, the nature of the wrong in this case – an unfinished construction subcontract subject to liquidated damages for delay – becomes more difficult and more expensive to remedy with lack of prompt notice and the ability to choose replacement contractors at a price that would mitigate Safeco's damages. Therefore, the less rigorous notice provision applied to the payment bond in the *Thomas* case is inapplicable to the performance bond in this case, and the Court's reliance on *Thomas* was in error.

Because the default declaration requirement of the performance bond was not met, Safeco's duties under the performance bond were not triggered. The Court vacates its Order denying Safeco's Motion for Summary Judgment and grants summary judgment in favor of Safeco.

### III. Conclusion

Safeco's Motion for Reconsideration, [Doc. 40], is granted. The January 29, 2015 Order denying Safeco's Motion for Summary Judgment, [Doc. 39], is vacated. Safeco's Motion for Summary Judgment, [Doc. 19], is granted.

s/ Nanette K. Laughrey
					NANETTE K. LAUGHREY
					United States District Judge

Dated:  May 4, 2015
Jefferson City, Missouri